ALBERT W. BETTIGOLE & others *vs.* ASSESSORS OF
SPRINGFIELD & others[1]
(and a companion case[2]).

Hampden.    November 6, 1961. — November 20, 1961.

Present: WILKINS, C.J., WILLIAMS, WHITTEMORE, CUTTER,
& SPIEGEL, JJ.

*Taxation,* Real estate tax: assessment; Personal property tax: assessment;
Assessors. *Constitutional Law,* Taxation. *Moot Question. Equity Ju-
risdiction,* Taxable inhabitants' suit, Declaratory relief, Tax. *Declara-
tory Judgment. Words,* "Share," "Proportional and reasonable."

A deliberate practice of the assessors of a city of classifying all the prop-
erties therein and fixing the assessed valuations of the properties in each
classification on the basis of a percentage of fair cash value which
varied substantially from the percentages assigned to other classifica-
tions, with the result that the taxes on the properties in certain classi-
fications were greater, and the taxes on the properties in other classi-
fications less, than they would have been had all the properties in the
city been assessed uniformly at full fair cash value, was illegal as in
violation of constitutional and statutory requirements for proportional
assessments.   [230–232]
Upon adequate allegation and proof of an intent of the assessors of a
city to assess taxes on all the properties therein according to a non-
proportional, discriminatory, and illegal method of fixing assessed valu-
ations, there was jurisdiction in equity in a suit by adversely affected
property owners to give declaratory relief to the effect that such assess-
ments on the plaintiffs' properties would be illegal and void and also
injunctive relief against such assessments thereon, and in a taxable
inhabitants' suit under G. L. c. 40, § 53, to give declaratory relief to
the effect that the proposed assessment scheme was wholly illegal and
void and also injunctive relief against the assessment of any taxes in
the city on the basis thereof.   [232–234, 235–236, 238]
Suits in equity seeking relief respecting the assessment and collection of
local taxes for a certain year based on an allegedly illegal assessment
procedure were neither premature nor tardy where they were commenced

---

[1] The collector of taxes and the auditor.

[2] The companion case is Henry I. Herchovitz & others *vs.* Assessors of Spring-
field & others. In that case the collector of taxes and the auditor are also
named as respondents. For convenience, the general term "plaintiffs" is used
as including the petitioners. The term "defendants" includes the respondents.

within a few days after the assessors had voted to adopt such procedure; nor were the cases moot when they reached this court in that year before there had been any substantial progress in the collection of the taxes. [234–235]

Equitable relief declaring void an illegal assessment procedure adopted by the assessors of a city affecting all the properties therein, and enjoining further action to assess and collect taxes for a certain year on the basis of such procedure, should not be denied on the alleged ground of practical difficulties where the statutory remedies respecting excessive and illegal taxes would be wholly inadequate and the suits seeking such relief reached this court in that year before there had been any substantial progress in the collection of the taxes and while there was still sufficient time to accomplish a new and proper assessment. [236–238]

Two BILLS IN EQUITY, filed in the Superior Court on September 21, 1961.

The suits were reported by *Quirico, J.*

*Lewis H. Weinstein,* (*Laurence S. Fordham* with him,) for the plaintiffs and petitioners.

*S. Thomas Martinelli,* City Solicitor, (*John J. O'Connor,* Associate City Solicitor, & *Cosmo M. Ansara,* Assistant City Solicitor, with him,) for the defendants and respondents.

CUTTER, J. These two bills in equity present questions about the validity of the proposed 1961 assessment of property taxes in Springfield. They have been argued together.

The Bettigole case is brought by individual, fiduciary, and corporate owners of multi-family dwellings, commercial real estate, and other property in Springfield which it is alleged "will be in 1961 and subsequent years . . . deliberately . . . over-valued and over-assessed both in relation to other classes of taxable real estate for which assessed valuations have been established at lower percentages of fair cash value and in relation to the general average or ratio of valuations to fair cash value of taxable real estate in" Springfield. It is alleged that the board of assessors (the board) has for many years established assessed valuations for different classes of real estate in the city at widely differing percentages of the full fair cash value of such real estate and plans to do so for 1961. The bill seeks a declaration as to the "lawfulness under the Constitution

and laws of [t]he Commonwealth of the policy and practice'' just described, and also injunctive relief (a) against continuance of this assessment practice by the assessors, and (b) against action to send out bills for, and to collect, the taxes so assessed. The Attorney General has been notified of the proceeding and afforded an opportunity to be heard.

The second case (the Herchovitz case) is a bill by sixteen taxable inhabitants under G. L. c. 40, § 53,[3] to restrain the raising and collection of money by real estate taxation in the manner alleged now to be intended. The allegations closely resemble those in the Bettigole case. Similar injunctive relief is sought and, in the prayer for general relief, a determination under G. L. c. 231A, § 6, is also requested.

Each case was presented in the Superior Court upon a statement of agreed facts, which (apart from paragraphs relating to the procedural aspects of the particular case) is closely similar to the other. Each case was reported without decision upon the pleadings and the statement of agreed facts. The facts are set out below as they appear in the statements of agreed facts.

By August 1, 1961, the board ''had determined the sound value [a term used by the board as equivalent to fair cash value] of each parcel of taxable real estate in the [c]ity as of January 1, 1961, and the fair cash value of the personal property owned by each [taxable] person.'' The board had also classified all parcels of real estate into six categories, set out below, and a majority[4] had voted on September 8 and 15, 1961, ''to establish . . . [1961] assessed valuations of all taxable property in the [c]ity by applying the following . . . percentages to the sound value determined

---

[3] Section 53 reads, ''If a town or any of its officers . . . are about to raise . . . money . . . in any manner other than that . . . in which such town has the legal and constitutional right and power to raise . . . money . . . the . . . superior court may, upon the petition of not less than ten taxable inhabitants of the town, determine the same in equity . . . .''

[4] The chairman of the board voted in opposition to the assessing scheme and in favor of ''real and personal property assessments . . . 'at fair cash value or sound value or 100%.' ''

by the . . . [board] for the following classes of property,''
respectively, viz., (1) single family residences — 50% ; (2)
two family residences — 60% ; (3) three family residences
— 65% ; (4) four or more family residences — 70% ; (5)
property of public utilities and commercial and industrial
properties — 85% ; (6) farms, vacant land, and other real
estate — 70%. Personal property subject to local taxation
was to be assessed at 85% of the fair cash value thereof
previously determined by the board.

"The [b]oard determined assessed valuations for 1960
in substantially the same manner as it intends to use in
1961 and 1962'' and the board's "practice of applying
varying percentages of sound or fair cash value of different
classes of property in arriving at assessed valuations was
deliberate and intentional.'' A table (Annex A), made a
part of each statement of agreed facts, is reproduced fol-
lowing this page. It shows, for example, that the fair cash
(sound) value of 22,005 parcels of single family residence
property was $266,285,568 (col. 3), but that these parcels
were assessed at an aggregate of $133,142,792 (col. 5) for
only 50% (col. 4) of their fair cash (sound) value. The
table indicates that, if all taxable property in the city had
been assessed at 100% of fair cash value, these 22,005 par-
cels would have been subjected to aggregate taxes of
$11,223,937 (col. 7) at a tax rate of $42.15 per $1,000 of
valuation, whereas they were in fact taxed only $8,601,024
(col. 6) under a tax rate of $64.60. The table also shows
that 2,521 parcels of public utility, commercial and indus-
trial properties, assessed at 85% of fair cash value (col. 4),
were in fact taxed $9,602,217 (col. 6), whereas, if all tax-
able property in the city had been assessed at 100% of fair
cash value, the aggregate tax on these 2,521 parcels would
have been only $7,370,792 (col. 7). This is the most strik-
ing comparison revealed by Annex A, and (although this is
not done in the statements of agreed facts) its effect can be
shown in tabular form (by a simple mathematical calcula-
tion from Annex A) as follows :—

Bettigole *v.* Assessors of Springfield.

ANNEX "A"

1961

| (1) Class | (2) Parcels | (3) Sound Value | (4) % Applied by Board | (5) Assessed Value | (6) Taxes Based on Assessments (at $64.60) | (7) Taxes based on 100% of Sound Value (at $42.15) |
|---|---|---|---|---|---|---|
| 1 Family | 22,005 | $266,285,568 | 50% | $133,142,792 | $ 8,601,024 | $11,223,937 |
| 2 Family | 6,980 | $ 70,700,535 | 60% | $ 42,420,461 | $ 2,740,361 | $ 2,980,028 |
| 3 Family | 1,339 | $ 13,770,109 | 65% | $ 8,952,735 | $ 578,352 | $ 580,410 |
| 4 or more Family | 1,177 | $ 34,999,607 | 70% | $ 24,500,071 | $ 1,582,703 | $ 1,475,233 |
| Sub-Total | 31,501 | $385,755,819 | | $209,016,059 | $13,502,440 | $16,259,608 |
| Public Utilities, Commercial and Industrial | 2,521 | $174,870,514 | 85% | $148,641,060 | $ 9,602,217 | $ 7,370,792 |
| Farms, Vacant Land and Other Real Estate | 8,089 | $ 18,058,125 | 70% | $ 12,642,662 | $ 816,737 | $ 761,150 |
| Total | 42,111 | $578,684,458 | 64% | $370,299,781 | $23,921,394 | $24,391,550 |
| Personal Property | (bills) 5,000 | $ 36,893,760 | 85% | $ 31,359,700 | $ 2,025,836 | $ 1,555,072 |
| Grand Total | 47,111 | $615,578,218 | 65.25% | $401,659,481 | $25,947,230 | $25,946,622 |

Bettigole *v.* Assessors of Springfield.

|  | (A)<br>Approximate percentage<br>of total fair cash<br>value of all taxable<br>property | (B)<br>Approximate percentage<br>of all property<br>taxes assessed on<br>*non-uniform* basis |
|---|---|---|
| 22,005 single family<br>residence parcels | 43% | 33% |
| 2,521 public utility,<br>commercial and<br>industrial parcels | 28% | 37% |

It thus appears that 43% of the total fair cash value of taxable property in Springfield is paying only 33% of the property taxes, whereas 28% of the total is paying 37% of the property taxes. The somewhat lesser disparity, produced by the board's assessment method, among various other classes of property is equally susceptible of mathematical demonstration.

By the use of electronic and other machines, the city auditor is able to produce a "valuation card," an assessed value and tax card, and a tax bill for (a) each real estate parcel, and (b) the personal property of each owner. On September 19, 1961, the "valuation cards" based on the sound values of each property had been "completed" by the application of the percentages (already listed) to the fair cash (sound) values as determined by the board for each class of property, and apparently also for each parcel in each category.

On September 20, 1961, the board announced a 1961 tax rate at $64.60 per thousand. The assessed value and tax cards had not then been produced and the tax list had not been submitted to the board and the board had not committed its tax list or warrant to the collector of taxes. We were told at the arguments on November 6, 1961, that the board had not then committed its warrant to the collector and that no tax bills had then been mailed. The board concedes that it "intends for 1961, and if the members . . . are in office for 1962, to establish assessed valuations for taxable property . . . by applying the foregoing or similar varying percentages to the sound [fair cash] value of such

property as determined by the [b]oard" and that tax bills based upon such assessed valuations and the tax rate announced or to be announced are to be sent out by the collector and collected.

The plaintiffs are owners of properties within the classes of four and more family residences, commercial and industrial properties, and farms, vacant land and other real estate, listed in detail in annexes to the bills. Because "they own such property . . . [each of the plaintiffs will] pay substantially more in taxes for 1961 if the [board's assessing] practice described . . . [earlier in this opinion] is followed than if the assessed valuations of all taxable property in . . . Springfield were the fair cash value of such property."

The plaintiffs "insist that, in accordance with the [C]onstitution and laws of the Commonwealth, the assessed valuations of all taxable property in . . . Springfield should be the fair cash value of such property." A majority of the board insists "upon following . . . [the above described] practice . . . and have refused to establish assessed valuations . . . at the fair cash value of . . . property."

"In order not to disrupt the business and affairs of" Springfield, the plaintiffs have agreed to the dissolution of a temporary restraining order entered on September 21, 1961, and that no preliminary injunction issue. This is to be without prejudice to the plaintiffs. The parties, so far as they have power to do so, have agreed that, except as "the case may have been moot at the time the bill [or petition] was filed . . . [it] shall not be treated as moot by virtue of any action taken in the assessment and collection of [1961] taxes . . . to the extent that the parties may so agree." Although the last quoted clause is ambiguous, the parties join in urging this court not to decide the case on the ground that it is moot as to 1961 or premature as to 1962.

1. These cases continue property tax controversies which have existed in Springfield in recent years. See *Carr* v. *Assessors of Springfield,* 339 Mass. 89; *Stone* v.

*Springfield,* 341 Mass. 246. The bills present for consideration, upon very complete, precise statements of agreed facts, the question whether the whole 1961 property tax assessment scheme violates the Constitution of the Commonwealth (Part II, c. 1, § 1, art. 4) which empowers the General Court "to impose and levy *proportional* and reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth . . ." (emphasis supplied). See also art. 10 of the Declaration of Rights, which reads, "Each individual . . . has a right to be protected . . . in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute *his share* to the expense of this protection . . ." (emphasis supplied). It is well settled that the words "his share" in art. 10 of the Declaration of Rights "forbid the imposition upon one taxpayer of a burden relatively greater or relatively less than that imposed upon other taxpayers." See *Opinion of the Justices,* 332 Mass. 769, 777. Similarly, "the expression 'proportional and reasonable' [in Part II, c. 1, § 1, art. 4] forbids the imposition of taxes upon one class of persons or property at a different rate from that which is applied to other classes." See *Opinion of the Justices,* 341 Mass. 738, 750. This interpretation of these constitutional provisions has been unvarying "from the early days of the Commonwealth to the present time." See *Opinion of the Justices,* 332 Mass. 769, 778–779, where the earlier decisions are collected; *Carr* v. *Assessors of Springfield,* 339 Mass. 89, 91–93; *Stone* v. *Springfield,* 341 Mass. 246, 248 (where it was said, "An intentionally made, widely disproportionate assessment would constitute a gross violation of 'a fundamental constitutional limitation upon the power . . . to impose property taxes' "). See also *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester,* 334 Mass. 287, 293; Nichols, Taxation in Massachusetts (3d ed.) §§ 63, 64, pp. 109–114. In *Cheshire* v. *County Commrs. of Berkshire,* 118 Mass. 386, 389, this court said that the constitutional provision for "proportional and reasonable" taxes

"forbids their imposition upon one class of persons or property at a different rate from that which is applied to other classes, whether that discrimination is effected directly in the assessment or indirectly through arbitrary and unequal methods of valuation." The court there recognized that "[p]ractically it is impossible to secure exact equality or proportion in the imposition of taxes" but it pointed out that the statutory "aim [should] be towards that result, by approximation at least." The statements of agreed facts negate any suggestion of "equality or proportion" in the 1961 Springfield assessments, for it is established that disproportion, rising to a maximum of the difference between 50% and 85% of fair cash value, "was deliberate and intentional" and that personal property and one class of real estate was thus to be assessed 170% (85/50) of the level of assessment of another class of real estate. This is not even equality by "approximation," which, at the least, requires attempted equality of assessment in absolute good faith and to the best of the abilities of the public officers charged with making valuations.

Not only do the assessing practices of a majority of the Springfield assessors violate the constitutional mandate, but they run counter to the clear intention of the statutes relating to local assessment of property taxes. General Laws c. 59, § 38, requires the "assessors of each city . . . [to] make a fair cash valuation of all the estate, real and personal, subject to taxation therein." See *Waltham Watch & Clock Co.* v. *Waltham,* 272 Mass. 396, 412; *Carr* v. *Assessors of Springfield,* 339 Mass. 89, 91. See also G. L. c. 59, § 43 (as amended through St. 1948, c. 112, § 1), § 45 (as amended through St. 1948, c. 112, § 2), and § 52, which provides that the assessors shall sign, at the end of the annual valuation list, under the penalties of perjury, a statement "that the real and personal estate contained in said list, and assessed upon each person in said list, is a full and accurate assessment upon all the property of each person, liable to taxation, at its full and fair cash value, according to our best knowledge and belief." General Laws c. 41,

§ 29, provides that each assessor take oath that, among other things, he "will truly and impartially, according to . . . [his] best skill and judgment, assess and apportion all . . . taxes . . . [and] that . . . [he] will neither overvalue nor undervalue any property subject to taxation." See also G. L. c. 41, § 30, which contains further provisions dealing with the subject of proportional tax valuations.

Upon the basis of the foregoing authorities, there can be no doubt that the board's proposed 1961 assessment scheme is a complete, widespread, and fundamental failure to comply with either the constitutional or the statutory requirements for proportional assessment. Accordingly, we must consider whether, in the circumstances, a remedy is available to the plaintiffs.

2. In *Dowling* v. *Assessors of Boston,* 268 Mass. 480, 483–486, it was held that a ten taxpayers' petition under G. L. c. 40, § 53, could be maintained to prevent "[d]eviations in essential particulars by the assessors from . . . [the] prescribed [statutory] directions, so as to produce material differences in the amounts . . . to be demanded of the taxpayer[s]," since the deviations would show that "the assessors . . . 'are about to raise . . . money' in a 'manner other than that . . . in which' the municipality has the legal 'right and power to raise . . . money.' " In the *Dowling* case, however, it was concluded (at p. 490) "that the method [there] adopted . . . for assessing taxes . . . [was] in conformity to the terms of the enabling statutes." Unlike the present cases, no question (see p. 491) was there presented of anything "disproportionate in the proposed tax levy." See for a case where relief was granted under c. 40, § 53, *Jenney* v. *Assessors of Mattapoisett,* 322 Mass. 76, 80–81.

In *Amory* v. *Assessors of Boston,* 306 Mass. 354, 356–358, it was decided that, in the circumstances, mandamus did not lie to force the assessors to perform their duties correctly in view of the availability of the remedy under c. 40, § 53. In a later case, *Amory* v. *Assessors of Boston,* 310 Mass. 199, ten taxpayers sought under c. 40, § 53, to restrain assessors

(see p. 200) "from valuing taxable property otherwise than at its fair cash value as determined by their honest judgment." There were somewhat general allegations that the assessors had "adopted a practice of valuing many parcels of the taxable real estate of the city . . . in amounts that they knew were far in excess of the fair cash value of such property," that such overvalued real estate was in particular parts of the city, and "that other real estate has not been overvalued." The court, although discussing various other issues, pointed out (p. 202) as a principal ground of decision that the petitioners in that case did "not allege that any parcel owned by any of them . . . [would] be overvalued by the" assessors, or that "the assessment . . . upon their [own] properties . . . [would] be excessive." It was indicated that the persons who might be affected had ample remedy by way of abatement proceedings and that § 53 was not intended to permit (at p. 203) "ten taxpayers, none of whom is illegally burdened by the assessment of a tax upon his property . . . [to] compel a revaluation of nearly all of the taxable real estate of a large city." The court there concluded that a demurrer to the petition should have been sustained and that, upon the showing made (see pp. 203–204), the petition before it seemed to present "a case where the method of assessment . . . [would] not impose any hardship on any taxpayer, the petitioners, or the city" and that the matter did not require the intervention of a court of equity. The second *Amory* case was unlike the present cases in that the present plaintiffs, in addition to showing a comprehensive and intentional scheme of disregarding determinations of fair cash value by disproportionate and discriminatory percentage adjustments of such value in computing assessments, also have established (if that be important under c. 40, § 53) that their own properties will be seriously and adversely affected by the unconstitutional disregard of the principle of proportionate assessment.

*Carr* v. *Assessors of Springfield*, 339 Mass. 89, was a ten taxpayers' petition similar to that in the second *Amory*

case. In the *Carr* case, it was not necessary to decide whether such a petition could be maintained. The case was not argued in this court until March, 1959, and by then (see pp. 92–93) it was "apparent that the . . . case . . . [had] become moot as to 1958 assessments." Also it was "inappropriate to assume and allege in 1958, over a year in advance [of the 1959 assessment], that the assessors" would not apply proper principles in the performance of their duties.

In *Stone* v. *Springfield*, 341 Mass. 246, we held that "because of the inadequacy and indefinite nature of the allegations," it was proper to sustain a demurrer to a declaration in an action (under G. L. c. 60, § 98) to recover taxes paid under protest. We then said (at p. 249) that "it would be reasonable to expect the plaintiff, without improperly stating evidence in his declaration, to make specific allegations of such asserted facts as would, if proved, establish invalid official action, as, for example, the precise nature of the lack of uniformity in assessments which he expects to prove and the circumstances indicating that it was intentionally discriminatory." In the present cases, there is no deficiency, either in pleading or in proof. The extent of the admitted discriminatory action has been established. The agreed facts show "a widespread scheme of intentional discrimination rather than merely isolated, inadvertent lack of uniformity." See the *Stone* case, *supra,* at p. 251.

The *Dowling* case (268 Mass. 480) establishes that equity jurisdiction exists in this type of case. Far more has been shown in the present cases than appeared in the second *Amory* case (310 Mass. 199) and in the *Carr* case (339 Mass. 89). We think that the agreed facts in the cases before us require the intervention of a court of equity, not only (a) to protect the plaintiffs from the violation of their constitutional and statutory rights in respect of their own property, but also (b) in the public interest.

The present suits were brought (see *Jenney* v. *Assessors of Mattapoisett,* 322 Mass. 76, 81; *Sears* v. *Treasurer & Recr. Gen.* 327 Mass. 310, 327) on September 21, 1961, only a few days after a majority of the board had voted (on

September 8 and 15, 1961) to adopt the illegal 1961 assessment procedure. Brought earlier, the suits might have been premature. When filed, they were neither premature nor tardy. The effort to raise money by this invalid assessment has not gone so far as to make these cases moot. In this respect, the *Carr* case is distinguishable. These bills in equity long preceded any commitment of the tax list to the collector of taxes under G. L. c. 59, § 53, or any actual issuing of tax bills. The final steps in the process of raising the annual taxes had not taken place when these bills were filed and the collection process still lies ahead. In the absence of adequate grounds (see part 3 of this opinion, *infra*) for denying injunctive relief as a matter of discretion, suitable injunctions should issue in the Herchovitz case against the assessors and the collector of taxes.

The Bettigole case seeks principally declaratory relief under G. L. c. 231A. In the *Stone* case, 341 Mass. 246, 251–252, we did not pass upon the argument then made in behalf of the city that declaratory relief (rather than the relief under G. L. c. 60, § 98, there sought) was appropriate. General Laws c. 231A, enacted by St. 1945, c. 582, § 1, substantially after the decisions in the two *Amory* cases, has been held to authorize declaratory relief in a tax case. At least where the plaintiffs show that they themselves will be directly and adversely affected by the imposition of the tax, a declaration may be made whether and to what extent a tax affects the rights of the parties to the particular case. See *Meenes* v. *Goldberg*, 331 Mass. 688, 691; *Madden* v. *State Tax Commn.* 333 Mass. 734, 736–737; *Dehydrating Process Co. of Gloucester, Inc.* v. *Gloucester*, 334 Mass. 287; *Squantum Gardens, Inc.* v. *Assessors of Quincy*, 335 Mass. 440, 443; *Stow* v. *Commissioner of Corps. & Taxn.* 336 Mass. 337, 339–340. See also *Newhall* v. *Assessors of Brookline*, 329 Mass. 100, 102. The situation may be different where the plaintiffs' interests (in contrast to the public interest represented by them as taxpayers under G. L. c. 40, § 53) have not been shown to have been adversely affected by proposed governmental action. Cf. *Povey* v. *School Comm. of Medford*, 333 Mass. 70, 71–72; *Berry* v. *Quincy*, 334 Mass.

703; *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 57–58. We hold that declaratory relief is appropriate.

The Bettigole case also seeks injunctive relief. The plaintiffs are entitled to such relief so far as the invalid assessment scheme affects their own properties.

3. The defendants contend that equitable relief should be denied because of the practical difficulties which Springfield will encounter if an injunction issues. We recognize, of course, the inherent difficulties. See Wilson, A New Aid to Equalization in Property Valuation, 40 B. U. L. Rev. 544, 547–549. Indeed, the courts properly are always slow to grant injunctive relief in tax matters of this type except upon a very clear showing of violation of fundamental constitutional or statutory rights. Our decisions in the *Amory, Carr,* and *Stone* cases illustrate this natural judicial restraint. Upon the present record, however, the balance of public interest seems to us heavily in favor of granting injunctive relief.

A majority of the Springfield assessors have disregarded the constitutional and statutory principles requiring proportional assessment, specifically pointed out to them as recently as the *Carr* case in 1959 and the *Stone* case in 1960. Where every assessment has been made on a wrong basis, the defects in the scheme cannot be cured by the sporadic correction of individual assessments. If abatements or refunds of taxes to the average level of proposed 1961 assessments (65.25% of fair cash value, see Annex A) were to be made with respect to all properties assessed above the average, Springfield would fall far short of raising the necessary 1961 funds. This would be so even after giving full effect to G. L. c. 59, § 82, which we view as designed primarily to permit recovery under G. L. c. 60, § 98, of only the amount in excess of that which the taxpayer would have been bound to pay if correctly assessed. See *Cone* v. *Forest,* 126 Mass. 97, 98–100. See also *Jenney* v. *Assessors of Mattapoisett,* 322 Mass. 76, 80. Section 82 does not prevent equitable relief. Also after such abatements and refunds, the assessment scheme would still not be proportional for there would still be assessments below the aver-

age. The defects inherent in the scheme cannot be cured by legislation for the Constitution does not authorize the enactment of such a scheme imposing taxes not proportional.

The illegal action of the majority has resulted in litigation and apprehension of confusion. Far greater confusion, as well as injustice to the plaintiffs, will result if equitable relief is not granted. The plaintiffs and others similarly situated could be required to pay 1961 taxes in excess of any valid tax upon them as a condition precedent to any available relief by abatement before the Appellate Tax Board. See G. L. c. 59, § 64 (as amended through St. 1956, c. 544). Their properties would be subject to excessive liens for taxes. See G. L. c. 60, § 37 (as amended through St. 1943, c. 478, § 1). The public considerations are even more important. If the assessment scheme is not enjoined, the inevitable consequence will be a multiplicity of abatement applications and actions under G. L. c. 60, § 98, creating unnecessary work for all concerned as well as congestion in the courts and before the Appellate Tax Board. Because of this congestion and consequent delays, the remedies (to the extent available in such a situation) under G. L. c. 59, §§ 59–65, each as amended, and c. 60, § 98, would be cumbersome, slow, and, as a practical matter, wholly inadequate. See the *Stone* case, *supra,* 341 Mass. 246, 250–251.

Fortunately, because of commendable coöperation by the parties, these cases have reached this court for decision very promptly after the board's adoption of the 1961 assessment scheme and before any substantial progress in the annual collection of taxes. We are of opinion that, in the circumstances, the practical and simple method of dealing with the situation is to enjoin execution of the unconstitutional assessment scheme and to declare it to be a nullity. Thus the way will be cleared for a wholly new assessment. See G. L. c. 59, § 23, as amended through St. 1955, c. 202, § 1; § 77, as amended through St. 1945, c. 333. It should be possible to accomplish such a new assessment rapidly through the use of the city auditor's electronic machines.

These machines appear to be capable of producing valuation cards based upon the fair cash value of each parcel of real estate, if, indeed, they have not already done so. These fair cash values, so far as appears in this record, have been determined by the assessors in good faith. To the full fair cash values thus fixed, a new tax rate can readily be applied, determined after taking into account the higher aggregate assessments from the use of full and fair cash values, as well as any other relevant factors (e.g. a suitable overlay, fixed in the light of the new situation under G. L. c. 59, § 25, as amended through St. 1953, c. 654, § 30). There thus is no insuperable obstacle to reasonable correction of the confused situation, well prior to the end of the present calendar year, which should lead us to deny relief. In view of the constitutional and statutory rights involved, we think that we have no adequate justification for postponing relief. Cf. *Switz* v. *Middletown,* 23 N. J. 580, 598, 599, 605–608.

4. In the Bettigole case (a) a declaration is to be made that the assessment of 1961 taxes against the plaintiffs' properties on the discriminatory percentage basis proposed by a majority of the board is illegal and void under the Constitution and statutes of the Commonwealth, and (b) the assessors and the collector of taxes are to be enjoined from taking any further action to assess, upon the properties of these plaintiffs listed in Annex C attached to the bill in equity, or to collect, any tax based upon such discriminatory percentage basis of assessment. In the Herchovitz case, (a) a declaration is to be made that the scheme for the assessment of 1961 taxes adopted by a majority of the board is wholly illegal and void and (b) an injunction is to issue against the assessors and the collector of taxes enjoining them, respectively, from proceeding further with the assessment and collection of any 1961 taxes upon property in Springfield which are based upon assessed valuations established by applying different percentages of fair cash value to different classes of taxable real estate or personal property.

*So ordered.*