BOARD OF ASSESSORS OF AMHERST *vs.* STATE TAX COMMISSION.

Suffolk. March 6, 1970. — May 11, 1970.

Present: WILKINS, C.J., SPALDING, KIRK, REARDON, & QUIRICO, JJ.

*Taxation,* Reimbursement for loss of taxes on Commonwealth land; Appellate Tax Board: findings. *Words,* "Fair cash value," "Land."

The Legislature, in directing the State Tax Commission by G. L. c. 58, § 13, to determine the "fair cash value" of "land" owned by the Commonwealth in a town for the purpose of computing a payment to it by the Commonwealth in lieu of taxes pursuant to § 17, intended the words "fair cash value" to be given the ordinary meaning of fair market value and not, as concluded by the Appellate Tax Board, the meaning of "assessed" value [509–510]; and intended that the word "land" was to be given the meaning of land with improvements, except buildings, and not, as concluded by the board, the meaning of unimproved land only [510–511].

The Appellate Tax Board, in stating that the basis of its decision as to the value of certain land was, among other factors, "its general familiarity with the area based on . . . [a] former trial," merely indicated its former acquaintance with the area and not that it had rested its decision on evidence not introduced as such at the hearing. [511]

APPEAL from a decision of the Appellate Tax Board.

*Lewis H. Weinstein (John H. Henn* with him) for the appellant.

*Bernard J. Dwyer,* Assistant Attorney General, for the State Tax Commission.

SPALDING, J.  On June 5, 1967, the State Tax Commission (commission) determined, pursuant to the provisions of G. L. c. 58, § 13, as amended through St. 1960, c. 593, § 1,[1] that the fair cash value of all land in the town of Amherst owned by the Commonwealth and used by the University of Massachusetts on January 1, 1967, was $792,800.  This determination was made for the purpose of computing a payment from the Commonwealth to the town in lieu of taxes, as provided in G. L. c. 58, § 17.  The board of assessors of Amherst (assessors), who had assessed the value of the university land (exclusive of buildings) at $9,868,200, applied to the Appellate Tax Board (board) for a correction of the determination.  G. L. c. 58, § 14.  After a hearing at which both parties presented evidence, the board decided that the fair cash value of the land in question was $1,342,610.  It also, at the request of the assessors, made findings of fact and a report.  From this decision the assessors appealed under G. L. c. 58A, § 13.

The basis of the assessors' appeal is certain rulings of law made by the board and the denial of certain rulings requested by the assessors.  These raise two issues: (1) Did the board correctly interpret "fair cash value of all land" as used in § 13;  (2) did the board err in allegedly relying on "knowledge" from a previous case between the parties?

---

[1] Provisions of this section here pertinent are: "In nineteen hundred and fifty-seven, and in every fifth year thereafter, the commission shall, between January first and June first, determine as of January first the fair cash value of all land in every town owned by the commonwealth and used for the purposes of . . . the University of Massachusetts . . . ."

1. In reaching its decision, the board interpreted "fair cash value" as used in § 13 to mean in substance the assessed value, rather than the market value, of the land in question. It further found that "land" meant "land" in its original state, that is, exclusive of buildings, and unenhanced by grading, drainage, utility, and all other improvements. It justified this interpretation, which varies from the usual meaning accorded these words elsewhere in the General Laws, by reference to the history of c. 58, § 13. The assessors, however, contend that as a matter of law such interpretation was erroneous because it modified, without justification, the "common and approved meaning" of the terms. In the assessors' view "fair cash value" can only mean the highest price which a hypothetical, willing buyer would pay to a hypothetical, willing seller in an assumed free and open market. See *Epstein* v. *Boston Housing Authy.* 317 Mass. 297, 299. The assessors contend that "land" means the land as it exists on the date of valuation, including all improvements, exclusive of buildings.

The resolution of this controversy depends on the meaning of "fair cash value of all land" as used in c. 58, § 13. Ordinarily statutory words and phrases are to be construed according to "the common and approved usage of the language" unless "inconsistent with the manifest intent of the law-making body." G. L. c. 4, § 6, Third. The words "fair cash value of all land" is controlled by the common and approved meaning of those words in other contexts, absent a contrary legislative intent. *Pacific Wool Growers* v. *Commissioner of Corps. & Taxn.* 305 Mass. 197, 199. The governing statutes require the Commonwealth to make annual payments to the town as reimbursement "for loss of taxes" on land owned by the Commonwealth and used by public institutions, including the University of Massachusetts. The amount of the Commonwealth's payment is computed from a valuation of the land made every five years by the commission, which is then multiplied by a rate fixed by c. 63, § 58.

A. Although the reimbursement scheme is unique, we are of opinion that the board erred in its interpretation of "fair

cash value" as the equivalent of "assessed valuation."
Nothing in the statute's history evinces a legislative intent
that "fair cash value" was to be used in any but its ordinary
sense. Indeed language in other sections of the statute in-
dicates that the legislative intent was to use "fair cash
value" in its usual sense. General Laws c. 58, § 15, pro-
vides for the valuation of land acquired by the State in the
periods between valuations by the commission. It states
that "the commission shall adopt the *assessed valuation* of
said land made in the year last preceding such acquisition
. . . until a *new valuation* is made by the commission" (em-
phasis added). Such language clearly distinguishes "fair
cash value" from "assessed valuation." It also suggests
that the commission's "new valuation" is other than the
"assessed valuation."

The board's conclusion that the Legislature had a con-
trary intent is not convincing. It cites first the statute's
legislative history as evidence that "fair cash value" was
not to have its ordinary meaning. The governing statute,
c. 58, §§ 13–17B, derives from St. 1910, c. 607. In c. 66 of
the Resolves of 1909, the Legislature directed the com-
missioner to investigate and report on the effect of tax ex-
emptions for the property of educational institutions on the
financial status of the cities and towns wherein they were
located. It further directed the commissioner to recommend
appropriate legislation. The commissioner's report, a sixty-
eight page document, with the bill attached to it entitled
"An Act relative to the reimbursement of certain cities and
towns," was filed as 1910 House Bill No. 1395. This bill
with only minor alterations was enacted as St. 1910, c. 607,
the predecessor of § 13 et seq.

The board reasoned that this report shows conclusively
that the meaning of "fair cash value" was "assessed valua-
tion" and that in enacting the bill, recommended by the
commissioner, the Legislature adopted this meaning. An
examination of the report, however, does not support this
interpretation. The only direct reference in the report to the
valuation of land by the commissioner reads: "In the bill

herewith submitted (Appendix D) I have with some hesitation provided that the *valuation of such land* should be made by the Tax Commissioner. He is probably the one officer of the Commonwealth in closest touch with property valuations, with boards of assessors and with the basis of valuation in the different municipalities" (emphasis added). The board concluded from this statement that conferring upon the commissioner the duty of valuation usually performed by the assessors would insure equal valuation of State and private land for tax purposes. In the board's view, the commissioner was to determine the assessed valuation of the property, in order to avoid disparities in the assessment of State and private land, which might result if the assessment of both were left to local authorities. Such disparities could result in the Commonwealth's bearing a disproportionate tax burden, a result in conflict with the statute's purpose of reimbursement for taxes *lost.* The board thus concluded that "fair cash value" as used in 1910 House Bill No. 1395 meant "assessed valuation."

The board's conclusions are unwarranted. Nothing in the language quoted suggests that "valuation" means "assessed valuation." The reference to the commissioner's expertise and knowledge of varying local practices merely qualifies him, rather than the local officials, as the appropriate person to determine the "fair cash value" of State land. Nor are the abuses envisaged by the board likely to occur if fair cash value carries its usual meaning. We recently decided in *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223, that all land must be assessed at full, fair cash value. It is, of course, not intended that Amherst shall shift a larger burden of municipal taxes to the Commonwealth by assessing privately owned property at less than full, fair cash value.[1] We find no basis either in the stat-

[1] The Commission refers in its brief to an alleged disparity in the assessors' valuation of State and private land. It appears that one and one-quarter square miles of university land was valued at $9,868,200 while about twenty-six and one-half square miles of taxable private land was valued at only $11,250,000. If in fact the town is not assessing all land, State and private, at fair cash value, then the Commonwealth may bring appropriate proceedings to compel compliance with the principles of the *Bettigole* case.

ute's history or purpose for the conclusion that the Legislature intended to give "fair cash value" other than its ordinary meaning.

B. Contrary to the commission's argument, there is no basis for the conclusion that the Legislature in enacting § 13 intended "land" to have any but the "common and approved" meaning it has when used in valuation contexts. In valuing land for purposes of tax assessment and eminent domain awards, "land" generally comprehends the improvements made to it. *Beale* v. *Boston,* 166 Mass. 53, 56. *Vineyard Grove Co.* v. *Oak Bluffs,* 265 Mass. 270, 277. See G. L. c. 59, § 3. The commission, however, relies on the legislative history of § 13 for its contention that the legislative intent was to employ "land" in the narrow sense of unimproved land. 1910 House Bill No. 1395 explains the exclusion of buildings from the commissioner's valuation on the ground that since they are paid for by the Commonwealth "no town can properly claim that it ever had any right to tax them." The report then states: "But for the action of the State no part of the value of the buildings and furnishings would ever have been in the towns. The basis for reimbursement thus becomes the value *of the land taken by the Commonwealth*" (emphasis added). If buildings are excluded because they are a product of the State's use of the land, it follows — so it is contended — that the value of all improvements made to the land must also be excluded. Improvements, it is said, like buildings, result from State activity, and therefore cannot properly be claimed by the towns to be taxable as of right.

We are of opinion, however, that the quoted section of the report does not control the scope of "land" as used in § 13. That language is addressed only to the exclusion of buildings from the valuation scheme. Applying similar reasoning to improvements, while logically consistent, conflicts with the statute's purpose of reimbursement for lost taxes. For State use of the land diminishes tax revenues in two ways. First, unimproved land otherwise generative of tax revenue is exempt from taxation; and second, the higher

tax yield resulting from improvements to that land is also lost because of the land's tax exempt status. The amount of tax revenue lost by State use of land thus is not to be measured solely by the original unimproved value of the land, but also includes the improvements which, if made, would raise the land's value and corresponding tax yield. The Legislature, in excluding buildings from the commissioner's valuation, has made a policy decision that the reimbursement shall not be fully compensatory. But we think that, within the limits of reimbursement set by the exclusion of buildings, the statutory purpose is best fulfilled by making that reimbursement compensatory so far as possible. It follows that "land" must be interpreted to include improvements.

2. The board in reaching its decision stated: "On the basis of all the facts found, as stated above, and the careful view taken by the board, as well as its *general familiarity with the area based on the former trial,* the board found that the fair market value . . . was $1,342,610" (emphasis supplied). The assessors contend that the italicized words show that the board relied on matters not before it, of which it could not take judicial notice, and which the assessors were not able to contest, all in derogation of its right to due process of law. We disagree. We interpret these words as meaning no more than that the board has merely indicated its former acquaintance with the particularities of the area through a case between the same parties in 1962. So interpreted, the challenged statement cannot be regarded as meaning that the board based its decision on evidence not introduced as such at the hearing. It was not, therefore, obnoxious to our holding in *Boott Mills* v. *Board of Conciliation & Arbitration,* 311 Mass. 223, 227.

The board's decision is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

*So ordered.*