## OPINIONS OF THE JUSTICES.

### OPINION OF THE JUSTICES TO THE
### HOUSE OF REPRESENTATIVES.

*Taxation*, Real estate tax: assessment. *Constitutional Law*, Taxation.

The General Court is empowered under art. 112 of the Amendments
to the Constitution to enact proposed legislation which would dele-
gate to local taxing entities, under described guidelines, the au-
thority to set the rates on the different classes of real property
established by the legislation and in some degree to vary those rates
in accordance with the local determination as to how the tax bur-
den should be allocated among the classes. [809-811]
The General Court is empowered under art. 112 of the Amendments
to the Constitution to enact proposed legislation that would provide
for municipal tax rates which would be proportional within each
class of property, but proportional only within each municipality;
proportional rates for each class throughout the Commonwealth are
not required. [812-815]

On July 6, 1979, the Justices submitted the following
answers to questions propounded to them by the House of
Representatives.

To the Honorable the House of Representatives of the
Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial
Court respectfully submit these answers to the questions
set forth in an order adopted by the House of Representa-
tives on May 29, 1979, and transmitted to us on May 30,
1979. The order recites that the Joint Committee on Tax-
ation has reported a bill printed as House Bill No. 6371,
entitled, "An Act making changes in the taxation of real
property by usage classification," and that grave doubt
exists with regard to the constitutionality of the bill. Two
questions are asked which will be set forth below.

*Background.* For an understanding of the purpose and
operation of the bill, it will be helpful to describe the
traditional constitutional constraints on taxation of real

property. Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth authorizes the General Court "to impose and levy proportional and reasonable assessments, rates and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said Commonwealth." (We leave for later discussion the 1978 addition to art. 4.) According to an interpretation "unvarying 'from the early days of the Commonwealth to the present time,' " the words "proportional and reasonable" prohibit "the imposition of taxes upon one class of persons or property at a different rate from that which is applied to other classes." *Bettigole* v. *Assessors of Springfield*, 343 Mass. 223, 230 (1961). Thus we held in the *Bettigole* case that it was a violation of art. 4[1] to assess one class of real property on a different basis from another, and in that way to discriminate between classes in respect to their contributions to the local tax levy.

In *Sudbury* v. *Commissioner of Corps. & Taxation*, 366 Mass. 558 (1974), we emphasized, not for the first time, that the legal duty was "to assess property at its 'fair cash valuation.' " *Id.* at 563. See G. L. c. 59, § 38. Recognizing that "illegal assessments have long been the rule rather than the exception throughout much of the Commonwealth," *id.*, we entered a judgment declaring that it was the obligation of the Commissioner of Revenue to assure compliance with the constitutional and statutory commands. In recent years this court has given effect to the requirement of proportional assessments in a variety of settings.[2]

---

[1] Also a violation of art. 10 of the Declaration of Rights of the Massachusetts Constitution, which provides, "Each individual . . . has a right to be protected . . . in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute *his share* to the expense of this protection . . ." (emphasis supplied). The Justices have said that the words "his share" "forbid the imposition upon one taxpayer of a burden relatively greater or relatively less than that imposed upon other taxpayers." *Opinion of the Justices*, 332 Mass. 769, 777 (1955).

[2] See *Tregor* v. *Assessors of Boston*, 377 Mass. 602 (1979); *Assessors*

Public opinion turned against the requirement of "100% valuation." Accordingly, the General Court approved in 1975 and again in 1977 a constitutional amendment adding, after the words "proportional and reasonable assessments, rates and taxes" in art. 4: "except that, in addition to the powers conferred under Articles XLI and XCIX of the Amendments, the general court may classify real property according to its use in no more than four classes and . . . assess, rate and tax such property differently in the classes so established, but proportionately in the same class, and except that reasonable exemptions may be granted."[3] The Amendment, amend. art. 112, was ratified by the people on November 7, 1978. By the amendment the General Court is empowered to impose different rates of taxation on different classes of real property, and thus to develop and operate a system which may be similar in practical effect to those declared unlawful in the *Bettigole* and *Sudbury* cases.[4]

---

*of Weymouth* v. *Curtis*, 375 Mass. 493 (1978); *Beardsley* v. *Assessors of Foxborough*, 369 Mass. 855 (1976); *Coomey* v. *Assessors of Sandwich*, 367 Mass. 836 (1975); *Assessors of Kingston* v. *Sgarzi*, 367 Mass. 840 (1975); *First Nat'l Stores, Inc.* v. *Assessors of Somerville*, 358 Mass. 554 (1971); *Butler* v. *Assessors of Worcester*, 354 Mass. 651 (1968); *Shoppers' World, Inc.* v. *Assessors of Framingham*, 348 Mass. 366 (1965).

[3] Article 4 now provides in pertinent part: "And further, full power and authority are hereby given and granted to the said general court, . . . to impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth, except that, in addition to the powers conferred under Articles XLI and XCIX of the Amendments, the general court may classify real property according to its use in no more than four classes and to assess, rate and tax such property differently in the classes so established, but proportionately in the same class, and except that reasonable exemptions may be granted."

Articles 41 and 99 grant the General Court broad authority over the taxation of wild or forest lands and agricultural or horticultural lands, respectively.

[4] According to a newsletter of the Massachusetts Municipal Association, the classification ratios of G. L. c. 59A, § 18, added by St. 1978, c. 580, § 38 (18), "are approximately the 1977 Statewide *average* assessments for such classes in the approximately 250 cities and towns

Statute 1978, c. 580, becoming effective upon ratification of amend. art. 112, is the present legislation which classifies real property under the new grant of authority. General Laws c. 59A, § 1, inserted by St. 1978, c. 580, § 38(1), provides that, in municipalities certified as having assessed property at its fair cash valuation—a foundational requirement—local assessors are to classify real property as residential, commercial, industrial or manufacturing, and open space. To the fair cash valuation of each class is applied a "classification ratio" specified in § 18: for residential property, 40%; for commercial, 50%; for industrial or manufacturing, 55%; and for open space, 25%. To obtain the taxable valuation for residential property, assessors first multiply the total residential assessment by 40%, and then subtract the exemption, allowed by § 17, of $5,000 for each residential parcel. The taxable valuations for the three other classes are obtained by multiplying their respective total assessments by the applicable percentages. The municipality determines how much revenue must be raised from its real property tax, and the rate of taxation is then computed by dividing the total revenue required by the aggregate amount of the taxable valuations.[5]

The effective rates on the full valuations vary with the relative amounts of the four classes of property and the

which have not yet gone to 100% valuation." The Beacon, Vol. IV, No. 12, at 6 (July, 1978) (emphasis in original).

[5] To illustrate: Assume a town has $95,000,000 in real property distributed as follows: $50,000,000 residential, $25,000,000 commercial, $15,000,000 industrial or manufacturing, and $5,000,000 open space. Applying the classification ratios, the taxable valuations for the latter three classes will be $12,500,000, $8,250,000, and $1,250,000 respectively. If 1,000 units are entitled to the $5,000 residential exemption, the taxable valuation for the first class will be $15,000,000, yielding a total taxable valuation of $37,000,000. If the town wishes to raise $1,000,000 from its real property tax, its over-all rate will be $1,000,000 divided by $37,000,000, or 2.7027%. The effective rates on the full valuations—adjusting for the residential exemption and the various classification ratios—will then be .81081%, 1.35135%, 1.486485%, and .675675%.

revenue the municipality desires to raise. The municipality, however, is not empowered to decide how to allocate the tax burden among the classes of property: that decision has already been made by the General Court in assigning the classification ratios. For example, a municipality may not tax open space property at a relatively lower rate than that yielded after applying the classification ratio, and make up the difference with a higher rate on commercial property.

*House Bill No. 6371.* The central feature of the bill is that it would allow the municipality a limited flexibility to allocate the tax burden among the several classes. The bill would repeal G. L. c. 59A, § 29. But like § 5 of that chapter, it would classify real property as residential, open space, commercial, and industrial. § 24. (Each class is defined in detail in § 19.) Property in all four classes[6] must be assessed at full and fair cash value—again a foundational requirement—but different rates of taxation would be applied to the classes. Those rates would be determined by a four-step process. First, the assessors would make a fair cash valuation of all real and personal property, and divide the real property thus valued into the four classes. § 19. This task would be carried out under rules, guidelines, and regulations promulgated by the Commissioner of Revenue. § 3. In addition, the Commissioner could require a variety of statements and reports from municipal officers and from individual property owners concerning the amount and value of the taxable property. By February 1 of each year, the Commissioner, so informed, would transmit assessed values and classifi-

---

[6] A question might be raised as to whether the bill, by allowing municipalities to allocate the tax burden among classes, in fact creates more than four such classes. But (as suggested in our text below) varying rates from one municipality to another have been understood not to create "classes" under art. 4 before its 1978 amendment, and we do not think that they should be understood to have that effect under the current constitutional text. For the same reason we would reject any suggestion that the bill proposes to classify real property according to location rather than use.

cations to the municipalities for use in setting tax rates. § 2.

Second, the local authority would determine the portions of the local tax burden to be borne by the several classes of property. § 1. That decision is made by choosing a "residential factor," which under the bill may be as high as 100% but may not be less than 70%. *Id.* The class one, or residential, percentage of the total tax levy would be computed by multiplying the residential factor by a fraction representing the full and fair cash value of all residential property in the municipality divided by the full and fair cash value of all real and personal property located therein. The class two, or open space, percentage would be calculated by multiplying 62½% of the residential factor by a fraction representing the full and fair cash value of the open space property divided by the full and fair cash value of all real and personal property. The class three, or commercial, percentage would be determined by multiplying the difference between 100% and the sum of the class one and class two percentages by a fraction representing the full and fair cash value of the commercial property divided by the sum of the full and fair cash value of commercial, industrial and personal property. The class four, or industrial, percentage would be computed by multiplying the difference between 100% and the sum of the class one and class two percentages by a fraction representing the full and fair cash value of industrial property divided by the sum of the full and fair cash value of commercial, industrial, and personal property. Finally, the personal property percentage would be determined by multiplying the difference between 100% and the sum of the class one and class two percentages by a fraction representing the full and fair cash value of the personal property divided by the sum of the full and fair cash value of the commercial, industrial, and personal property.

Third, after determining the various percentages, the assessors would notify the local accountant or treasurer

of the amount to be raised by the tax on real and personal property. § 23. This amount would be divided among the various classes of property by use of the percentages.

Fourth, to determine the rates of tax on the several classes, the total amount to be obtained from each class would be divided by the total value of the property in that class.[7]

By reducing the residential factor below 100%, cities and towns may to some degree vary the percentages and thus the rates to be imposed on the several classes. As the factor is reduced, a higher share of the total tax burden will be borne by commercial, industrial, and personal property. A town which seeks to tax the classes of commercial and industrial property at a high rate as compared with residential and open space will, therefore, be inclined to lower the residential factor. But because the residential factor cannot fall below 70%, there are severe limitations on the permissible extent of the variations. In all cases the rate on open space property will be less than that on residential property, which will be less than that on commercial, industrial, and personal property, all three of which will be identical.[8]

---

[7] To illustrate: Assume that, in a particular town, there is a total of $100,000,000 in real and personal property distributed as follows: $50,000,000 residential, $5,000,000 open space, $25,000,000 commercial, $15,000,000 industrial, and $5,000,000 personal. Assume further that the residential factor chosen is 100%. The residential percentage is ($50,000,000 ÷ $100,000,000) × 100%, or 50%; the open space percentage is ($5,000,000 ÷ $100,000,000) × 62.5%, or 3.125%; the commercial percentage is ($25,000,000 ÷ $45,000,000) × (100% − 53.125%), or 26.04166%; the industrial percentage is ($15,000,000 ÷ $45,000,000) × (100% − 53.125%), or 15.62499%; and the personal property percentage is ($5,000,000 ÷ $45,000,000) × (100% − 53.125%), or 5.20833%. Assume finally that the town must raise $1,000,000 from taxes on real and personal property. Applying the percentages, the residential class must contribute $500,000; open space, $31,250; commercial, $260,417; industrial, $156,250; and personal, $52,083. The rates will thus be 1% for residential; .625% for open space; and 1.04166% for commercial, industrial, and personal.

[8] The variations in the rates caused by reducing the residential factor will increase with the relative proportions of residential and open space property.

Nonetheless, the major feature of the bill is that it would permit a locality some flexibility in distributing the tax levy among the several classes of property. The order accompanying the bill recites that a "statewide proportion mandated for each class of property within each city and town would be unworkable given the varying 'prudential concerns' (Chief Justice Shaw, *Willard* v. *Newburyport*, 12 Pickering 227 at 231) of each city and town as well as the different amounts of the various classes of property located within the particular cities and towns," and suggests that "each of the three hundred and fifty-one cities and towns knows best what portion of the total costs of its government should be borne by each of the classes within its borders." The bill is an effort to respond to these concerns.

*The Questions.* 1. The first question asks:

"Is it constitutionally competent for the General Court to enact House Bill, No. 6371 which would permit each city and town, within the guidelines established by said bill, to set rates for each class of property within each city and town under the provisions of Article IV of Section 1 of Chapter 1 of Part the Second of the Constitution of the Commonwealth?"[9]

Article 4, as amended in 1978, provides (we repeat) that "the general court may classify real property according to its use in no more than four classes and . . . assess, rate and tax such property differently in the classes so established . . . ." The question presented here is whether, the General Court having exercised its constitutional power to classify real property, it may lawfully *delegate* to local taxing entities, under the guidelines described, the au-

---

[9] In answering the two questions put to us, we confine ourselves to a consideration of art. 4, the constitutional provision mentioned in these questions; we do not consider other possible relevant constitutional provisions, State or Federal. Also, we consider the bill in its general aspects and not in any particular applications.

thority to set the rates on the different classes and in some degree to vary those rates in accordance with the local determination as to how the tax burden should be allocated among the classes.[10]

For almost two centuries the General Court has delegated to municipal authorities the power to assess property and to determine the rates of tax thereon.[11] The delegation has been made necessary by the perceived awkwardness of imposing a Statewide rate of tax despite the differing revenue requirements of the localities, as well as the varying amounts and kinds of real property in those areas. The delegation has taken place under the constitutional language vesting full power (as described) in the General Court. The legality of the delegation has been so thoroughly assumed as settled that it has never been subject to challenge in this Commonwealth. Its constitutionality, however, is implicit in our opinions: "Each town determines for itself what amount of expenditure its wants require, or its valuation and local circumstances will justify; and of course the rates differ very widely in different places." *Providence Inst. for Sav.* v. *Boston,* 101 Mass. 575, 586 (1869). Thus a commentator has properly concluded: "The rule that the power of taxation is incapable of delegation is subject to one universally recognized exception, namely, that the legislature may grant to municipal corporations the power of taxation for municipal purposes to be exercised by them .... The power of the legislature to authorize municipal corporations to levy taxes for the purpose of providing the necessary revenue to defray the expenses of their municipal government and to pay for the construction of public improve-

---

[10] Cities and towns have no independent power of taxation. See art. 2 of the Amendments to the Massachusetts Constitution, as appearing in art. 89, §§ 1, 6, and 7 (home rule principles reserve power to levy, assess and collect taxes to the General Court). See *Duffy* v. *Treasurer & Receiver Gen.,* 234 Mass. 42, 47 (1919), appeal dismissed, 255 U.S. 580 (1921); *Cox* v. *Segee,* 206 Mass. 380, 382 (1910).

[11] See the early statute, St. 1785, c. 75, § 7.

ments within their respective limits has been exercised for so long a time that its existence is not open to dispute." P. Nichols, Taxation in Massachusetts 21 (3d ed. 1938).

The statute in force at present, based on the amended constitutional provision, delegates to each local unit the power to fix a rate which is applied to the differential valuations of the four classes of property, as legislatively determined, to produce the amount needed to cover fiscal needs. The classes of property are in fact taxed at different effective rates, as we have seen. By the bill, the local unit is given authority, within limits fixed by the Legislature, to establish differential percentages for the classes of property,[12] and rates, which are the effective rates, are then set mathematically to make good the fiscal requirements. The power that would be delegated under the bill may be viewed as somewhat broader than that exercised under previous legislation stemming from the original and amended constitutional provisions, but the difference would not be such as to make the delegation constitutionally vulnerable. There would be no abdication of legislative responsibility. The municipalities would carry out their customary roles of establishing effective rates suited to local conditions. There would merely be some novelty and some added flexibility in the details of the process.[13].

We answer the first question, "Yes."[14]

---

[12] We need not say whether any different considerations might apply if the power of classification were in some measure delegated to local units.

[13] Compare analogous delegations to municipal authorities in other areas, such as zoning. See *Leahy* v. *Inspector of Bldgs. of New Bedford*, 308 Mass. 128, 131 (1941); *Bradley* v. *Board of Zoning Adjustment of Boston*, 255 Mass. 160, 170-171 (1926).

[14] We are not called on to say whether a different conclusion might be warranted if limits on the delegated municipal power like those now set forth in the bill were omitted from it.

2. The second question asks:

"Is it constitutionally competent for the General Court to enact House Bill, No. 6371 which would provide for tax rates which would be proportional within each class of property, but proportional only within each of the three hundred and fifty-one taxing districts under the provisions of Article IV of Section 1 of Chapter 1 of Part the Second of the Constitution of the Commonwealth?"

The amendment to art. 4, after stating that the General Court may classify real property and assess, rate, and tax the property differently in the classes established, adds the proviso, "but proportionately in the same class." The question put is whether the requirement of proportionality would be satisfied by proportionality of rates of tax in each class within each municipality, or, whether, on the contrary, it demands proportional rates for each class throughout the Commonwealth. Under the bill the rates as to any given class would vary from municipality to municipality as they selected different residential factors and had different mixes of property in the four classes and varying fiscal needs.

Article 4, prior to amendment, was understood to mean that municipal tax rates must be uniform within each municipality, not that they must be uniform across the Commonwealth.[15] Thus in *Providence Inst. for Sav.* v. *Bos-*

---

[15] The municipal power to set rates has been taken to qualify the general proposition, referred to in cases involving Statewide taxes, that "[a] tax is proportional, within the meaning of the Constitution, only when it bears the same ratio to the whole sum raised by taxation as the taxpayer's taxable estate bears to the whole taxable estate of the Commonwealth." *Opinion of the Justices*, 220 Mass. 613, 621 (1915). See P. Nichols, Taxation in Massachusetts 112 (3d ed. 1938).

Contrast art. 44 of the Amendments to the Constitution providing that an income tax "may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate *throughout the commonwealth* upon incomes derived from the same class of property" (emphasis supplied).

*ton, supra* at 586, the court said: "The rate in one town may be very different from the rate in the adjoining town; but it is not necessary, in order to meet the requirement that taxes shall be proportional, that the rate shall be identical in all the very great number of municipal corporations throughout the state . . . . [O]f course the rates differ very widely in different places, yet they have never been called in question as not being proportional, on account of discrepancies of that nature." And in *Northampton* v. *County Comm'rs of Hampshire*, 145 Mass. 108, 111 (1887): "It is not necessary, in order that taxes should be proportional, that the rate should be identical in all the municipal corporations of the State. However widely rates may differ, it cannot be held that they are not proportional on account of differences of that nature." For more recent expressions of the same view, see *Opinion of the Justices*, 356 Mass. 751, 755 (1969); *Opinion of the Justices*, 324 Mass. 724, 729 (1949).

There is no reason to believe that proportionality under the amendment of art. 4 was intended to require that municipal tax rates be uniform Statewide, thus departing radically from the meaning long attributed to the cognate expression in the original text of art. 4. The present statute assumes, we believe correctly, that the requirement of uniform rates (for each class of property) relates to the individual municipality, not the State; and the same would hold in respect to the bill. It is true that rates under the bill would be set in a novel way, but that would not affect the meaning of the requirement.

It has been suggested[16] that proportionality under the constitutional provision as amended requires that there be Statewide uniformity in the sense that property of a given value in each class must bear the same percentage of the respective municipal tax burdens: thus taxes would

---

[16] In a brief submitted by Massachusetts Taxpayers Foundation, Inc., as a friend of the court, in response to the court's general invitation to any interested organizations or persons to submit briefs.

have to be so contrived that, for example, industrial property in towns A and B, of the same valuation and constituting the same percentage of the total valuation in both towns, would bear the same percentage of the total respective municipal tax burdens, although the rates of tax and the actual amounts of the taxes payable might differ because the fiscal needs of the two municipalities differed. The proffered interpretation draws no support from the language of art. 4, its policy, or our prior decisions. On the contrary, variations in percentage contributions are a necessary product of the classification amendment and the resulting imposition of different rates of tax on the several classes. Even if residential factors or assessments were set Statewide for the four classes, property of the same value in each class and representing the same percentage of the total valuation would bear different percentages of the total tax levy in different municipalities whenever there were varying mixes of the four classes in those municipalities.[17]

---

[17] The point may be illustrated by an example. If the fair cash value assessment of a particular municipality is $1,000,000, composed of 40% residential property ($400,000), 10% open space ($100,000), 40% commercial property ($400,000), 5% industrial property ($50,000), and 5% personal property ($50,000), and if the officials chose a residential factor of 80%, the percentage of the levy for each class would be as follows:

| Type of Property | | Formula | | |
|---|---|---|---|---|
| Residential | $\dfrac{400,000}{1,000,000} \times$ | 80% | = | 32 % |
| Open Space | $\dfrac{100,000}{1,000,000} \times$ | (80% × 62½%) | = | 5 % |
| Commercial | $\dfrac{400,000}{500,000} \times$ | (100% − 37%) | = | 50.4% |
| Industrial | $\dfrac{50,000}{500,000} \times$ | (100% − 37%) | = | 6.3% |
| Personal Property | $\dfrac{50,000}{500,000} \times$ | (100% − 37%) | = | 6.3% |
| | | | | 100 % |

We answer the second question, "Yes."[18]

The foregoing answers and opinions are submitted by the Chief Justice and the Associate Justices, subscribing hereto on the sixth day of July, 1979.

> EDWARD F. HENNESSEY
> FRANCIS J. QUIRICO
> ROBERT BRAUCHER
> BENJAMIN KAPLAN
> HERBERT P. WILKINS
> PAUL J. LIACOS
> RUTH I. ABRAMS

---

If the fair cash value assessment of another municipality is the same — $1,000,000 — but composed of 80% residential property ($800,000), 5% open space ($50,000), 5% commercial property ($50,000), 5% industrial property ($50,000), and 5% personal property ($50,000) and if 80% is again chosen as the residential factor, the percentages will differ for industrial and personal property even though the property of those classes had the same value and represented the same percentage of both municipalities' total assessment:

| Type of Property | | Formula | |
|---|---|---|---|
| Residential | $\dfrac{800,000}{1,000,000} \times$ | 80% | =64% |
| Open Space | $\dfrac{50,000}{1,000,000} \times$ | $(80\% \times 62\frac{1}{2}\%)$ | = 2.5% |
| Commercial | $\dfrac{50,000}{150,000} \times$ | (100%−66.5%) | =11.166666% |
| Industrial | $\dfrac{50,000}{150,000} \times$ | (100%−66.5%) | =11.166666% |
| Personal Property | $\dfrac{150,000}{150,000} \times$ | (100%−66.5%) | =11.166666% |
| | | | 100% |

---

[18] We do not, of course, express any view as to the wisdom or expedience of the proposed bill.