JOSEPH LETO & others *vs.* BOARD OF ASSESSORS OF WILMINGTON & others
(and a companion case[1]).

Middlesex. November 5, 1964. — December 2, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Taxation,* Real estate tax: assessment. *Constitutional Law,* Taxation. *Equity Pleading and Practice,* Bill.

---

[1] John R. Evans & others *vs.* Board of Assessors of Wilmington & others, a ten taxpayers' bill under G. L. c. 40, § 53.

Statement of the circumstances in which a court of equity may prevent
the enforcement of the whole of an illegal municipal tax assessment for
a given year.  [148–149]
In suits in equity attacking the assessment of taxes in a town for a certain
year, diffuse and confusing allegations in the bills did not set forth
basic facts showing sufficiently a present occasion for substituting
declaratory or injunctive relief respecting the assessment for the usual
statutory remedies.  [149]

Two BILLS IN EQUITY filed in the Superior Court on
August 25, 1964.

The suits were reported by *Fairhurst, J.*

The case was submitted on briefs.

*Alexander E. Finger & Joseph F. Courtney* for the plaintiffs.

*Philip B. Buzzell & Charles M. Ewing* for the defendants.

CUTTER, J.   Leto and others seek declaratory relief concerning the methods used in assessing property in Wilmington for 1964 taxes.   In the companion case, the plaintiffs seek to restrain further action with respect to the 1964 tax assessment.   A demurrer to each bill, addressed to the bill as a whole, was sustained.   Each case has been reported by the trial judge for the decision of this court.   See G. L. c. 214, § 30.

The bill in the Leto case alleges the following facts.   In 1955 and 1956, the town established a "consistent scheme . . . for ascertaining the fair cash value of all taxable real estate on a uniform, consistent, and equitable basis."   In 1962, the assessors doubled the valuations theretofore determined on each parcel "to approximate 100% of fair cash value for each such parcel."   The assessors voted for "a general revaluation to be conducted in 1965."   For the taxes of the year 1964, however, the chairman of the assessors "submitted revaluations made solely by him on only that land . . . zoned for commercial and industrial use.[2] These revaluations increased assessments "from 300% to 1,900%" on "20% of all taxable land in the town," including land of the plaintiffs and were accepted by a major-

---

[2] The bill says, "The revaluations distinguished . . . [such] land from . . . all other taxable classes of real estate by not subjecting such other land to similar revaluations and . . . did not include revaluations of land used commercially and industrially . . . located in other zoned areas . . . ."

ity of the assessors.[3]   No similar revaluations were made of other land with minor exceptions.   The most significant allegations are "that the chairman of the [b]oard [of assessors] admitted that most residential land was assessed at a ratio of 79% to 82% of fair cash value and . . . was not generally revalued" in 1964 while "commercial and industrial land was purportedly assessed at full cash value" and actually at "substantially in excess of fair cash value."

Upon the basis of earlier allegations the bill states as conclusions (a) that the valuations "cast a disproportionate tax burden" on the plaintiffs; and (b) that the assessors "deliberately and intentionally" have established and are pursuing a policy of assessing real estate "on a non-proportional basis . . . discriminatory against many taxpayers, including the" plaintiffs.   The bill also states that the chairman of the assessors conducted this revaluation of land in industrial and commercial zones by himself without participation by other assessors who acted thereon without understanding the chairman's methods, and in a manner different from that employed in prior years.

The bill in the Evans case (fn. 1) contains essentially the same allegations in substantially the same somewhat general and vague language.   The allegations in both cases are diffuse and confusing and not made with the precision found in the careful statement of agreed facts described in *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223.

In the *Bettigole* case, and in *Opinion of the Justices,* 344 Mass. 766, 768, we have recently discussed or referred to the statutory and constitutional requirements that property taxation be "proportional" and that property subject to

---

[3] It is also alleged that one or more of the assessors have admitted that a revaluation only of land zoned for industrial and commercial use was adopted, that changes in other valuations were mainly based upon a limited number of sales and upon specific improvements of particular parcels, and that no similar revaluation was made of nonindustrial and noncommercial land.   By implication at least the plaintiffs seem to have alleged that there has been "failure or refusal . . . to revalue [at all] commercial and industrial structures and improvements," presumably as distinguished from commercial and industrial land.   After reciting these and other allegations, mentioned in the body of this opinion, the plaintiffs "allege [all of them] as facts."

local taxation be taxed at full and fair cash value. See e.g. Constitution of the Commonwealth, Part II, c. 1, § 1, art. 4, and art. 10 of the Declaration of Rights; G. L. c. 59, §§ 38, 52. The duty of assessors was stated in the *Bettigole* case, 343 Mass. 223, 230–232. These opinions state what continues to be the law of the Commonwealth.

The difficulties of allegation, proof, timeliness, or appropriate remedy, frequently encountered by those who bring proceedings to test the constitutional and statutory validity of all one year's assessments and the whole tax levy for that year in a particular town, are illustrated by decisions discussed and cited in the *Bettigole* case. See e.g. *Dowling* v. *Assessors of Boston,* 268 Mass. 480; *Amory* v. *Assessors of Boston,* 306 Mass. 354; *Amory* v. *Assessors of Boston,* 310 Mass. 199; *Carr* v. *Assessors of Springfield,* 339 Mass. 89; *Stone* v. *Springfield,* 341 Mass. 246. See also notes, 75 Harv. L. Rev. 1374; 42 B. U. L. Rev. 246. Such a general attack upon a tax levy presents important public issues and formidable problems of proof. To grant wholesale relief, rather than to remit the complaining taxpayers to less drastic remedies, may seriously affect a town's ability to conduct its public services and cause great fiscal confusion.

Other remedies, even if not wholly satisfactory,[4] afford some measure of relief from disproportionate assessments. See e.g. G. L. c. 59, § 59 (as amended through St. 1963, c. 125), § 64 (as amended through St. 1956, c. 544), § 65 (as amended through St. 1945, c. 621, § 6); G. L. c. 60, § 98. The existence of such remedies sometimes has been taken into account in determining whether a court should grant

---

[4] The *Carr* case, at pp. 92–93, the *Stone* case, at pp. 250–251, and the *Bettigole* case, at p. 237, suggest respects in which the usual statutory remedies may prove to be inadequate. As we said in the *Stone* case (at p. 251), "an assessment may be excessive in a constitutional sense, not because land is assessed at a figure in excess of its fair cash value, but because it is assessed at [fair cash value or] less than fair cash value while the land of other taxpayers is intentionally assessed at . . . lower percentages of the full, fair cash value of such land." At p. 250, we pointed out that applications for abatement of real estate taxes have often been "dealt with in relation to whether the taxpayer's land is assessed for more than its fair cash value and without regard to whether other property is assessed at its full, fair cash value."

relief in equity or by extraordinary writ.   Even in the *Bettigole* case, 343 Mass. 223, 236–238, where the facts of a grossly nonproportional assessment scheme were plainly established, full consideration was given to whether practical difficulties and the public interest required that relief be denied.   We said (at p. 236) that "the courts properly are always slow to grant injunctive relief in tax matters of this type except upon a very clear showing of violation of fundamental constitutional or statutory rights."   In the *Stone* case, 341 Mass. 246, 249, we pointed out the necessity, in cases of this general type, of making "specific allegations of such asserted facts as would, if proved, establish invalid official action, as, for example, the precise nature of the lack of uniformity in assessments which . . . [the plaintiffs expect] to prove and the circumstances indicating that it was intentionally discriminatory, rather than caused by inadvertence, mistake, or incompetence."   We went on to discuss (at p. 250) the "necessity of specific allegations if judicial inquiry is not to cover an unduly wide range in a case of this character" in which a plaintiff "essentially asks the court to make 'a revaluation of nearly all of the taxable real estate of a large . . .' " community.   We noted that, in this type of litigation, "courts should be slow to deal with issues of fact or law relating to properties other than those of the litigants before it, unless clearly required to do so."

The *Bettigole* case establishes that a court of equity may prevent the enforcement of the whole of an illegal city or town tax assessment for a given year.   The authorities just cited, however, make it plain that such somewhat extraordinary relief will not be granted (1) unless basic facts exist showing essentially a deliberate and substantial violation[5] of the constitutional and statutory requirements that property tax valuations shall be proportional; (2) unless the plaintiffs show themselves to be directly, significantly

[5] In essence it must be shown that the assessors are taking action intended to circumvent the constitutional and statutory requirements, or that such circumvention is the natural and probable consequence of this action.

and adversely affected; (3) unless relief by ordinary abatement procedures or by an action at law will be seriously inadequate; and (4) unless equitable relief is shown to be practicable[6] and appropriate in the sense that the assessors' constitutional and statutory violations are so great as to warrant seasonable equitable interference with normal tax assessment and collection processes. There must be clear and precise allegation of facts which if proved will satisfy each of the foregoing prerequisites, if a bill in equity seeking such drastic relief is to be good against demurrer. No intendment will be made in favor of the allegations of such a bill in the face of a demurrer. See *Mairs* v. *Madden,* 307 Mass. 378, 380. There is particular practical reason in such cases that there be strict adherence to the requirement that averments of crucial facts be clear, direct, and unequivocal (see *North Station Wine Co. Inc.* v. *United Liquors, Ltd.* 323 Mass. 48, 51) so that the trial of very complicated issues of fact may be kept within reasonable limits.

Viewed in the light of these requisites, the diffuse and confusing allegations of these bills, although they may suggest that the assessors' procedures were improper or likely to result in some degree of nonproportional assessment, do not state a case for equitable relief. The allegation that land of the plaintiffs was revalued in 1964, perhaps, may be sufficient (taken with other allegations) to state discrimination against them as owners of commercial or industrial land, but even this allegation is largely by implication. We think, however, that the allegations concerning what the assessors have done are fatally indefinite and incomplete when they should have been full and incisive. Even if the allegations concerning the adoption of the 1955–1956 valuation scheme imply that thereafter the assessments were for a time proportional, it does not necessarily follow that they remained so as late as the 1962 doubling of the assessments. Indeed, it is alleged that the board in 1964 decided that a

---

[6] This does not mean that questions of discretion whether to grant relief are open upon demurrer. See *Massachusetts Chiropractic Laymen's Assn. Inc.* v. *Attorney Gen.* 333 Mass. 179, 180. The bill, however, must allege at least the minimum facts essential to establish that any equitable relief is feasible.

new revaluation in 1965 was necessary and that the board chairman started in 1964 such a revaluation "on only that land . . . in the areas zoned for commercial and industrial use." It does not appear that these revaluations were not necessary to bring the assessments of the revalued land to the level of fair cash value, or that the proposed 1964 assessments are not more nearly proportional than those in effect in 1963. The allegation that some land assessments were increased as much as 300% to 1900% suggests that the preëxisting valuations had become very much out of line. It is not clearly alleged whether any structures (as distinguished from land, see fn. 3) were revalued in 1964 and it is not explicitly alleged that the aggregate assessments of land and structures will not be proportional, although, perhaps, that may be stated by implication.

The allegations most nearly setting out a violation of the principles stated in the *Bettigole* case are the general conclusions quoted above that "most residential land was assessed at . . . 79% to 82% of fair cash value" and that "commercial and industrial land was purportedly assessed at full cash value," or more. Obviously no deliberate policy of assessing residential land and structures at 80% of fair cash value and commercial and industrial land and structures at 100% (or more) of fair cash value will comply with constitutional and statutory requirements. If alleged clearly and proved seasonably, equitable relief against such an assessment scheme should be granted on the principles declared in the *Bettigole* case. The basic specific facts alleged (see *James Constr. Co. Inc.* v. *Commissioner of Pub. Health*, 336 Mass. 143, 146; *Weinstein* v. *Chief of Police of Fall River*, 344 Mass. 314, 317) do little to support these general conclusions. If it was intended to allege a general scheme of intentional, serious, and nonproportional assessment, the basic facts supporting that assertion have not been set out with clarity and precision.[7] Indeed, the basic

---

[7] Indefiniteness and lack of clarity also characterize the allegations concerning the conduct of the chairman of the assessors in his relation to his colleagues. These do little more than to suggest, in very general terms, that the

facts are consistent with the view that the 1964 revaluations are the first (and perhaps the most immediately needed) steps in conducting in an orderly manner the general revaluation voted for 1965.[8]   No allegations of fact, if proved, would justify the conclusion that the process of revaluation has been, or will be, unduly extended in time, or that the prompt revaluation by the assessors of land in residential zones is not contemplated, or that the assessors plan any continuing disparity of assessment ratios and levels among different classes of property.   The bills do not aver any history of disparity comparable to the circumstances described in the *Carr, Stone,* and *Bettigole* cases.

In the light of these considerations we think that the demurrers were properly sustained.   The allegations of basic facts in these bills do not show sufficiently that there is present occasion for substituting declaratory or injunctive equitable relief for the usual statutory remedies.[9]

*Interlocutory decree sustaining*
*demurrer affirmed in each case.*

---

full time chairman's revaluation activities (see St. 1950, c. 592, § 13) were approved by the chairman and one other assessor, without as much understanding by that assessor of the chairman's methods or as much exercise of intelligent independent judgment by him, as would have been desirable.

[8] We assume that a general revaluation of a whole town normally will require a period of time and that most communities endeavor to maintain some stability in assessments, from year to year, subject to a continuing process of readjustment to reflect not only changes in properties but also clearly discernible long term trends in market conditions as distinguished from sporadic or short term fluctuations of a few prices.

[9] Although the trial judge in sustaining the demurrers denied leave to amend the bills, this is a case where it would be appropriate for the Superior Court to exercise discretion to allow further prompt amendments of the bills, if the obscurity of the bills here discussed can be promptly and adequately corrected.